# EXHIBIT A

## POST-PETITION SENIOR SECURED LOAN AGREEMENT

This Post-Petition Senior Secured Loan Agreement (the "Agreement") is made as of January 16, 2017, among (i) A.M. Precision Machining Inc., debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined herein) (the "Borrower"), and (ii) Jerzy Kozlowski, or any successor thereto or assignee (the "Lender").

### RECITALS:

A. On December 14, 2016 (the "Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"). Borrower's case is currently pending before the Bankruptcy Court under Case No. 16-39379 (the "Chapter 11 Case").

B. An immediate and ongoing need exists for Borrower to obtain funds in order to provide for, among other things, the administration of the Chapter 11 Case and to fund certain post-Petition Date expenses related to Borrower's ownership of certain real properties. Accordingly, Borrower has requested that Lender extend post-petition financing.

C. Lender is willing to provide post-petition financing and incur additional obligations pursuant to Bankruptcy Code section 364(c)(2), but only for the purposes and upon the terms and conditions set forth in this Agreement.

D. It is contemplated by the parties hereto that the Bankruptcy Court will enter a Final Order (as defined herein) which will approve this Agreement and will authorize Borrower, pursuant to Bankruptcy Code section 364, to incur senior secured indebtedness under the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties agree as follows:

**1.     DEFINITIONS**

Capitalized terms used in this Agreement shall have the following respective meanings when used herein:

1.1     "Affiliate" shall mean with respect to any Person (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, five percent or more of the stock or partnership interest having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person or any Affiliate of such Person or (c) each of such Person's officers, directors, joint ventures and partners. For the purpose of this definition, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of such Person's management or policies, whether through the ownership of voting securities, by contract or otherwise.

1.2 "Agreement" shall mean this Post-Petition Senior Secured Loan Agreement including the schedules and exhibits attached hereto.

1.3 "Bankruptcy Code" shall mean Title 11 of the United States Code, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.4 "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, or any other court having competent jurisdiction over the Chapter 11 Case.

1.5 "Budget" shall mean the budget attached hereto as Schedule 2 setting forth the expenses and other items that are to be satisfied by the Loans.

1.6 "Budget Month" shall mean a month that is the subject of the Budget.

1.7 "Business Day" shall mean any day on which banks are open for business in the State of Illinois.

1.8 "Chapter 11 Case" shall mean Borrower's Chapter 11 case brought before the Bankruptcy Court and designated as Case No. 16-39379.

1.9 "Claim" shall have the meaning set forth in Bankruptcy Code section 101(5).

1.10 "Closing Date" shall mean a date that is ten (10) Business Days after the entry of the Final Order or such earlier date after entry of the Final Order agreed to by Borrower and Lender.

1.11 "Default" shall mean any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

1.12 "Default Interest Rate" shall mean twelve percent (12%).

1.13 "Default Hearing" shall have the meaning set forth in Section 10.5 hereof.

1.14 "Event of Default" shall have the meaning set forth in Section 10.1 hereof.

1.15 "Final Order" shall mean the order entered by the Bankruptcy Court pursuant to Bankruptcy Code section 364(d), in a form and substance acceptable to Lender in its sole discretion, approving this Agreement and authorizing the incurrence by Borrower of post-petition senior secured indebtedness in accordance with the terms and conditions of this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in a form and substance that is satisfactory to Lender. The Final Order shall grant Lender (1) a perfected first priority Lien on, and security interest in, all present and after acquired property of Borrower pursuant to Bankruptcy Code 364(d) and (2) an allowed administrative expense claim with superpriority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b) pursuant to Bankruptcy Code Section 364(c)(1) with respect to Borrower's Obligations.

1.16    "GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

1.17    "Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including, without limitation, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured, but not including obligations to trade creditors incurred in the ordinary course of business), (b) all obligations evidenced by promissory note, debentures, bonds, or similar instruments, (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (d) all indebtedness referred to in clauses (a) through (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (e) the Obligations, and (f) any guaranty of such Person relating to any Indebtedness set forth in clause (a)-(e) above.

1.18    "Interest Rate" shall mean seven percent (7%).

1.19    "IRC" shall mean the Internal Revenue Code of 1986 (or any successor legislation thereto), as amended from time to time.

1.20    "IRS" shall mean the Internal Revenue Service, or any successor thereto.

1.21    "Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the law of any jurisdiction).

1.22    "Loan" shall mean an advance made by Lender to Borrower pursuant to this Agreement, and "Loans" shall mean all such advances.

1.23    "Loan Amount" shall mean an amount not to exceed one hundred ten thousand dollars ($110,000.00), or such other amount as may be agreed to in writing by the Parties.

1.24    "Maturity Date" shall have the meaning set forth in Section 2.3 hereof.

1.25    "Note" shall have the meaning set forth in Section 2.2(b) hereof.

1.26    "Obligations" means the Loans, the accrued interest thereon, and all other advances, debts, fees, expenses, liabilities, obligations, covenants and duties owing by Borrower to Lender of every type and description, present or future, whether or not evidenced by any note,

3

guaranty or other instrument, directly arising under or relating to this Agreement or under any other Post-Petition Loan Document, whether or not for the payment of money, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including, without limitation, those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

    1.27    "Other Taxes" shall have the meaning set forth in Section 2.8(b) hereof.

    1.28    "Parties" shall mean, collectively, Lender and Borrower.

    1.29    "Permitted Variance" shall mean expenses and disbursements that do not exceed the amounts set forth in Budget for the relevant Budget Month by more than ten percent (10%) in the aggregate.

    1.30    "Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government (whether Federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

    1.31    "Petition Date" shall mean December 14, 2016.

    1.32    "Post-Petition Collateral" shall have the meaning set forth in Section 4.1 hereof.

    1.33    "Post-Petition Loan Documents" shall mean this Agreement, the Note, and all other instruments and agreements executed in connection with this Agreement.

    1.34    "Taxes" shall have the meaning set forth in Section 2.8(a) hereof.

    1.35    "United States Trustee" shall mean the United States Trustee appointed to serve in the Northern District of Illinois pursuant to 28 U.S.C. § 581 *et seq*.

    1.36    Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP consistently applied. That certain terms or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing. All other undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the Bankruptcy Code to the extent the same are used or defined therein. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including any schedules and exhibits attached hereto, as the same may from time to time be amended, modified or supplemented and not to any particular section, subsection or clause contained in this Agreement.

    1.37    Each reference to a section or exhibit are to a section or exhibit of or to this Agreement, unless otherwise specified or the context otherwise requires.

1.38  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

**2.**  **AMOUNT AND TERMS OF LOAN**

2.1  Commitment to Provide Loans.  Lender agrees, on the terms and conditions set forth in this Agreement, to make Loans to the Debtor from time to time prior to the Maturity Date in an aggregate principal amount not exceed to the Loan Amount, provided that (a) no Event of Default has occurred or is continuing and (b) the Loans advanced are used solely for the expenses and items set forth in the Budget attached hereto as Schedule 2.

2.2  Method of Borrowing.

(a)  Borrower shall request Loans by submitting a written request to Lender.  Lender shall honor each loan request if (a) the request would not cause the aggregate amount of outstanding Loans to exceed the Loan Amount, (b) no Event of Default has not occurred and is continuing, and (c) the Loans advanced are used solely for the expenses and items set forth in the Budget.  Each request for an advance shall constitute a representation by the Debtor that each of the conditions to Loans in Article 3 has been satisfied and that each of the representations and warranties in Article 5 of this Agreement is true and complete in all material respects as of the date of such request.

(b)  Each advance made by Lender shall constitute a Loan, and shall be evidenced by a promissory note made payable to Lender, substantially in the form attached hereto as Exhibit A (the "Note").  Lender or its representatives shall record the date and amount of each Loan in a ledger, which ledger shall constitute *prima facie* evidence of the accuracy of the information therein recorded.  The entire unpaid balance of the Loans and all accrued and unpaid interest thereon and any other Obligations shall be due and payable on the Maturity Date.

2.3  Maturity Date.  The Loans shall mature, and the principal amount of all outstanding Loans, together with all accrued and unpaid interest thereon and all other Obligations that may be due to Lender under this Agreement, shall be immediately due and payable from the assets of Borrower or the proceeds of the disposition thereof by Borrower to Lender upon (the "Maturity Date"):

(a)  The earliest of the following (i) December 31, 2018, or (ii) the date of acceleration of the Obligations upon the occurrence of an Event of Default; or

(b)  Such other date as agreed to in writing by Lender and Borrower or its successor in interest.

Notwithstanding the occurrence of the Maturity Date or any other provision of this Agreement, Lender shall advance funds to Borrower to satisfy the outstanding fees of Borrower's professionals through and including such Maturity Date, pursuant to and in accordance with the Budget not to exceed one hundred ten thousand dollars ($110,000), when such fees are allowed by a Final Order of the Bankruptcy Court.

5

2.4  Repayment and Prepayment.

(a)  The entire unpaid principal amount of the Loan, together with all accrued and unpaid interest thereon and all other Obligations that may be due to Lender under this Agreement, shall be due and payable on the Maturity Date.

(b)  Borrower may prepay the Loan or any portion thereof at any time which prepayment shall be applied, first, to accrued and unpaid interest on such Loan and capitalized interest, fees and expenses, if any, on the Obligations and, second, to principal in respect of the Loan.

2.5  Use of Proceeds.  The proceeds of the Loans shall be used only to pay the expenses and items set forth in the Budget, in accordance with the Budget, subject to the Permitted Variance.  The proceeds may also be used to pay any balance due after a sale of assets to American Heartland Bank.

2.6  Interest on Loan.  Interest on the Loans shall accrue at a rate per annum equal to the Interest Rate of 4% per annum.

2.7  Access.  Lender and its respective agents or representatives shall have the right during normal business hours (or at such other times as may reasonably be requested by Lender) to inspect, audit and make extracts from all of Borrower's records, files and books of account.  Borrower shall instruct its banking and other financial institutions, accountants and other advisors and agents to make available to Lender such information and records as Lender may reasonably request.

2.8  Taxes.

(a)  Any and all payments by Borrower hereunder or under the Note shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, or withholdings attributable thereto and all liabilities with respect thereto (all such levies, imposts, deductions, charges, withholdings and liabilities, excluding taxes imposed on or measured by the net income of Lender by the jurisdictions under the laws of which Lender are organized, qualified, or otherwise doing business or any political subdivision thereof, being hereinafter referred to as "Taxes").  If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions Lender receive an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law.

(b)  Within thirty (30) days after the date of any payment of Taxes, Borrower shall furnish to Lender, at the addresses for Lender referred to in Section 10.14, the original or a certified copy of a receipt evidencing payment thereof.

6

(c)     Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this Section 2.8 shall survive the Maturity Date and the payment in full of principal and interest hereunder and under the Note.

**3.     CONDITIONS PRECEDENT FOR FUNDING OF LOANS**

Lender's obligation to make a Loan to Borrower is subject to the satisfaction of each of the following conditions precedent on any relevant borrowing date:

3.1     Lender shall have received a fully executed copy of this Agreement, the Note and any other Post-Petition Loan Documents;

3.2     The Final Order shall have been entered by the Bankruptcy Court and shall not have been vacated, revised, modified or amended;

3.3     All of Borrower's representations and warranties contained in this Agreement and the other Post-Petition Loan Document, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each Loan with the same effect as if made on and as of such date; and

3.4     No default or Event of Default shall have occurred and be continuing.

**4.     SECURITY**

4.1     Borrower's Obligations shall be secured by a valid, perfected and first-priority Lien on all assets and properties of Borrower now owned or hereafter acquired, including, without limitation, the following (the "Post-Petition Collateral"):

(a)     All of Borrower's now-owned and hereafter acquired or arising accounts, accounts receivable and rights to payment of every kind and description, and all of Borrower's contract rights, chattel paper, documents and instruments with respect thereto, together with all fees and other payments due Borrower in connection and all of Borrower's rights, remedies, security and liens, in, to and in respect of such accounts, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party;

(b)     All moneys, securities, cash, cash equivalents, and other property and the proceeds thereof, now or hereafter held or received by, in transit to, in possession of, or under the control of Lender or a bailee or an Affiliate of Lender, from or for Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of Borrower's deposits (general or special), balances, sums and credits with Lender at any time existing;

(c)     All of Borrower's now owned and hereafter acquired or arising general intangibles and any other property of every kind and description with respect to, evidencing, or relating to their accounts, accounts receivable, and other rights to payment;

        (d)     All of Borrower's other general intangibles (including, without limitation, any proceeds from insurance policies after payment of prior interests), contract rights, goodwill, chose-in-action, claims, and permits, licenses, certifications, authorizations and approvals, and the rights of Borrower thereunder, issued by any governmental, regulatory, or private authority, agency, or entity whether now owned or hereafter acquired, together with all cash and non-cash proceeds and products thereof;

        (e)     All of Borrower's now owned or hereafter acquired real property, machinery, equipment, tools, tooling, furniture, fixtures, goods, supplies, materials, together with additions, parts, fittings, accessories, special tools, attachments, and accessions, and all replacements and substitutions thereof; and

        (f)     The income, profits, and proceeds of all of the foregoing.

     4.2     Lender will be entitled to the protections and priorities provided under Bankruptcy Code section 507(b).  No other claim having a priority superior to that granted to Lender by the Final Order shall be granted while any portion of the Obligations remains outstanding.

     4.3     Upon entry of the Final Order, the Liens and security interests granted to Lender on the Post-Petition Collateral by virtue of the Final Order and this Agreement shall be first, valid and perfected without regard to applicable federal, state or local filing or recording statutes; <u>provided</u>, <u>however</u>, that Lender may, but need not, take such steps as it deems desirable and applicable to comply with such statutes.

**5.**     **REPRESENTATIONS AND WARRANTIES**

     Borrower hereby represents and warrants to Lender that:

     5.1     <u>Organization; Powers</u>.  Borrower has all requisite power and authority to: (a) own his property and assets and to carry on his business as now conducted and as proposed to be conducted; and (b) execute, deliver and perform its obligations under this Agreement and each of the Post-Petition Loan Documents.

     5.2     <u>Authorization</u>.  The execution, delivery and performance by Borrower under this Agreement and each of the Post-Petition Loan Documents will not violate (c) any provision of law, statute, rule or regulation applicable to Borrower, (b) any order of any governmental authority applicable to Borrower, or (c) any provision of any indenture, agreement or other instrument to which Borrower is a party or by which any of them or any of their property is or may be bound.

     5.3     <u>Enforceability</u>.  This Agreement and each of the Post-Petition Loan Documents has been duly executed and delivered by Borrower and constitutes a legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms, subject to the Bankruptcy Code.

      5.4      Use of Proceeds.  Borrower shall use the proceeds of the Loans only to pay the expenses and items set forth in the Budget, in accordance with the Budget.

**6.      REPORTING REQUIREMENTS**

      Borrower covenants and agrees that from and after the Closing Date and until the Maturity Date, it shall deliver the following to Lender:

      6.1      As soon as practicable, but in any event within five (5) Business Days after Borrower becomes aware of the existence of any Default or Event of Default, telephonic or facsimile notice specifying the nature of such Default or Event of Default or development or information, including the anticipated effect thereof;

      6.2      Copies of all federal, state, and local tax returns and reports filed by Borrower;

      6.3      Copies of all notices given, motions and documents filed, and orders entered in the Chapter 11 Case; and

      6.4      Such other information regarding Borrower's businesses, financial condition, or prospects as Lender may, from time to time, reasonably request.

**7.      AFFIRMATIVE COVENANTS**

      The following covenants shall be binding on Borrower from and after the date hereof and until the repayment in full of the Obligations:

      7.1      Books and Records.  Borrower covenants and agrees to keep adequate records and books of account with respect to its business activities, in which proper entries, reflecting all of their financial transactions, are made in accordance with GAAP.

      7.2      Compliance with Law.  Borrower covenants and agrees to comply with all federal, state and local laws and regulations applicable to him, including environmental laws, except where such noncompliance is not reasonably expected to have a material adverse effect on Borrower, his businesses or his financial positions.

      7.3      Supplemental Disclosure.  From time to time as may be necessary (in the event that such information is not otherwise delivered by Borrower to Lender pursuant to this Agreement), so long as there are Obligations outstanding, Borrower covenants and agrees to supplement or amend each representation herein with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in an exception to such representation or which is necessary to correct any information in such representation which has been rendered inaccurate thereby.

      7.4      Filing of Financing Statement with Respect to Scott Collateral.  From time to time as may be necessary, so long as there are Obligations outstanding, Borrower covenants and agrees to execute such financing statements and other documents and to do such other acts as Lender may require to perfect and preserve Borrower's security interest in, and to enforce such interests in the Scott Collateral.

**8.**    **NEGATIVE COVENANTS**

The following covenants shall be binding on Borrower from and after the date hereof and until the repayment in full of the Obligations:

8.1    Sales of Assets.  Borrower may sell, lease, transfer, convey or otherwise dispose of any obsolete equipment or unneeded equipment.

8.2    Events of Default.  Borrower shall not take or omit to take any action, which act or omission would constitute a Default or an Event of Default.

8.3    Indebtedness. N/A.

8.4    Liens.  Borrower shall not create or permit any Liens on any of its properties or assets except the Liens existing as of the Petition Date and the Liens created under this Agreement and the Post-Petition Loan Documents.

8.5    Lease Obligations.  Borrower shall not create, incur, or suffer to exist any obligations as lessee (a) for the payment of rent for any real or personal property in connection with any sale and leaseback transaction entered into after the Petition Date, or (b) for the payment of rent for any real or personal property under leases entered into after the Petition Date.

**9.**    **TERM**

9.1    Termination.  Subject to the provisions of Section 9 hereof, the Loans provided for under this Agreement shall be in effect from the Closing Date until the Maturity Date.

9.2    Survival of Obligations upon Termination of Financing Arrangement.  No termination or cancellation of any financing arrangement under this Agreement (regardless of the cause or procedure) shall in any way affect or impair the duties and obligations of Borrower or the rights and powers of Lender relating to any transaction or event occurring prior to such termination and all claims granted to Lender hereunder shall continue in full force and effect until all Obligations are paid in full.  All undertakings, agreements, covenants, warranties, and representations contained in the Post-Petition Loan Documents shall survive such termination or cancellation and shall continue in full force and effect until such time as all of the Obligations have been paid in full in accordance with the terms of the agreements creating such Obligations.

**10.**    **EVENTS OF DEFAULT; RIGHTS AND REMEDIES**

10.1    Events of Default.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    Borrower fails to pay the Loans on the Maturity Date (whether by acceleration or otherwise) or any other Obligation when due;

(b)    Borrower breaches, defaults, or fails or neglects to perform, keep or observe any covenant or provision of this Agreement, the Note, or any other Post-Petition Loan

10

Document, and the same shall remain unremedied or unwaived for a period ending on the first to occur of (i) three (3) Business Days after Borrower receives written notice from Lender or (ii) ten (10) days after Borrower first becomes aware thereof;

        (c)    Borrower's expenses for any particular Budget Month exceeds the amount set forth in the Budget by more than the Permitted Variance for the relevant week;

        (d)    Any representation, warranty, certification or statement made by Borrower in this Agreement, any Post-Petition Loan Document, or any document to which Borrower and Lender are parties or by Borrower in any certificate, financial statement or other document delivered pursuant hereto or thereto proves to have been incorrect in any material respect when made;

        (e)    This Agreement shall cease to be effective to grant a perfected security interest in the Post-Petition Collateral with the priority stated to be created thereby or such security interest shall cease to be in full force and effect or shall be declared null or void, or the validity or enforceability of such security interest or this Agreement shall be contested by Borrower;

        (f)    Borrower, by motion, adversar action or other means challenges or disputes in any manner, the nature, extent or validity of Lender's Lien on the Post-Petition Collateral or Lender's Lien on the Lender's prepetition collateral (including the first secured mortgages of Lender in and to each of the properties identified on **Schedule 1** hereto;

        (g)    If Borrower breaches or violates any term of the Final Order;

        (h)    Dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

        (i)    Appointment of a Chapter 11 trustee in the Chapter 11 Case.

    10.2    <u>Contractual Remedies</u>.  Upon the occurrence and during the continuation of an Event of Default, Lender may, without notice, (a) terminate this Agreement, whereupon all outstanding Obligations will be immediately due and payable, and (b) exercise any and all rights and remedies provided under this Agreement and the Post-Petition Loan Documents.

    10.3    <u>Legal Remedies</u>. Upon the occurrence and during the continuation of an Event of Default, Lender may, without notice, exercise all rights and remedies provided under the Uniform Commercial Code in effect in any applicable jurisdiction and under any other applicable law.  The rights and remedies provided for under this Section 10.3 include, without limitation, the following:

        (a)    The right to take possession of, send notices regarding, and collect directly the Post-Petition Collateral, with or without judicial process, and to exercise all rights and remedies available to Lender with respect to the Post-Petition Collateral under the Uniform Commercial Code or otherwise applicable law in effect in any jurisdiction in which such Post-Petition Collateral is located; and

11

        (b)      The right to (by its own means or with judicial assistance) take possession of the Post-Petition Collateral, or render it unusable, or dispose of the Post-Petition Collateral on such premises without any liability for rent, storage, utilities, or other sums. Borrower hereby covenants and agrees that they will not resist or interfere with such actions.

        10.4    <u>Payments on Collateral</u>. Without limiting the rights of Lender under any other provision of law or this Agreement, immediately upon and following the occurrence of an Event of Default, all payments received by Borrower under or in connection with any of the Post-Petition Collateral shall be held by Borrower in trust for Lender, shall be segregated from other funds of Borrower and shall forthwith upon receipt by Borrower be turned over to Lender, in the same form as received by Borrower (duly indorsed by Borrower to Lender, if required to permit collection thereof by Lender).

        10.5    <u>Relief From Stay</u>.

        (a)      Immediately and automatically upon the entry of the Final Order, Lender shall have irrevocable and presently effective stay relief. Pursuant to such stay relief, all stays and injunctions in the Chapter 11 Case, including, but not limited to, the automatic stay arising on the Petition Date under Bankruptcy Code section 362(a), will be terminated automatically and irrevocably as to Lender and with respect to the enforcement of its remedies against the Post-Petition Collateral under this Agreement and the Post-Petition Loan Documents upon the occurrence and during the continuation of a Default or Event of Default.

        (b)      Without limiting the foregoing, Borrower will have the limited right to challenge the occurrence of a Default or Event of Default by requesting a hearing before the Bankruptcy Court upon five (5) business days written notice to Lender (the "<u>Default Hearing</u>"). Upon receiving notice of the Default Hearing, and pending the Bankruptcy Court's decision as to whether a Default or Event of Default has occurred (but in no event for more than five (5) business days after the beginning of the Default Hearing), Lender will refrain from exercising its remedies with respect to the Post-Petition Collateral and will abide by the terms of any subsequent decision of the Bankruptcy Court. Upon the later of (i) the expiration of the five (5) business day period referenced above or (ii) the conclusion of the Default Hearing, if any, and unless the Bankruptcy Court finds that no Default or Event of Default has occurred or is continuing, Lender shall be irrevocably appointed, with full power of substitution, as Borrower's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in Lender's own name, to take any and all appropriate actions and to execute any and all documents, instruments, and court filings which may be necessary or desirable to liquidate or collect the Post-Petition Collateral or otherwise accomplish the purposes of this Agreement.

**11.**    <u>**MISCELLANEOUS**</u>

        11.1    <u>Indemnity</u>. Borrower shall indemnify and hold Lender harmless from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements, including those incurred upon any appeal) which may be instituted or asserted against or incurred by Lender as the result of its having entered into this Agreement or any of the Post-Petition Loan Documents

12

or having extended credit hereunder, excluding any such suits, actions, proceedings, claims, damages, losses, liabilities, or expenses arising from the gross negligence and/or willful misconduct of Lender.

  11.2 <u>Complete Agreement</u>.  This Agreement and the Post-Petition Loan Documents shall constitute the complete agreement between the parties with respect to the subject matter hereof and may not be modified, altered or amended except by an agreement in writing signed by Borrower and Lender, with any material modification, alteration, or amendment approved by the Bankruptcy Court after notice and a hearing.

  11.3 <u>Sale of Interests</u>.  Borrower may not sell, assign, or transfer this Agreement or any of the Post-Petition Loan Documents or any portion thereof, including, without limitation, Borrower's duties and obligations thereunder.  Borrower hereby consents to Lender's sale of participation, assignment, transfer or other dispositions, at any time or times, of any of the Post-Petition Loan Documents or of any portion thereof or interest therein, including, without limitation, Lender's rights, title, interest, remedies, powers, or duties thereunder, whether evidenced by a writing or not.

  11.4 <u>Modification of Agreement</u>.  No amendment or waiver of any provision of this Agreement, the Note, or any other Post-Petition Loan Document, nor consent to any departure by Lender therefrom, shall in any event be effective unless the same shall be in writing and signed by each of Lender and Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

  11.5 <u>No Waiver by Lender</u>.  The failure of Lender at any time to require strict performance by Borrower of any provision of this Agreement, the Note, or any other Post-Petition Loan Document shall not waive, affect, or diminish any right of Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver by Lender of a default or Event of Default by Borrower under this Agreement, the Note, or any other Post-Petition Loan Documents shall not suspend, waive, or affect any other default or Event of Default by Borrower under this Agreement, the Note, or any other Post-Petition Loan Document whether the same are prior or subsequent thereto and whether of the same or of a different type.  None of the undertakings, agreements, warranties, covenants, and representations of Borrower contained in this Agreement shall be deemed to have been suspended or waived by Lender, unless such suspension or waiver is by an instrument in writing signed by Lender and directed to Borrower specifying such suspension or waiver.

  11.6 <u>Additional Remedies</u>.  Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that Lender may have under any other agreement, including, without limitation, any Post-Petition Loan Document, the Bankruptcy Code, by operation of law or otherwise.  This Agreement is without prejudice to any rights of Lender under the Bankruptcy Code or under applicable non-bankruptcy law.

  11.7 <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be

ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

      11.8    Parties.  This Agreement, the Note, and the Post-Petition Loan Documents shall be binding upon Borrower and its respective successors, and shall inure to the benefit of Lender and its assigns, transferees and endorsees.

      11.9    Conflict of Terms.  Except as otherwise provided in this Agreement or the Note by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in the Note, the provision contained in this Agreement shall govern and control.

      11.10    Governing Law; Litigation.  Except as otherwise expressly provided in any of the Post-Petition Loan Documents, in all respects, including all matters of construction, validity and performance, this Agreement and the Obligations arising hereunder shall be governed by, and be construed and enforced in accordance with, the laws of the State of Illinois applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws, and any applicable laws of the United States of America.

      11.11    Waiver of Jury Trial.  Borrower hereby waives trial by jury in any action or proceeding of any kind or nature in any court in which an action may be commenced arising out of this Agreement or any assignment thereof or by reason of any other cause or dispute whatsoever between them of any kind or nature.

      11.12    **[Intentionally Left Blank]**

      11.13    Notices.  Except as otherwise provided herein, whenever it is provided in this Agreement that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be delivered in person by electronic transmission, or facsimile addressed as follows:

      (a)    If to Borrower, at the following addresses:

          Jeffrey Strange (jstrangelaw@aol.com)
          Jeffrey Strange & Associates
          717 Ridge Road
          Wilmette, Illinois 60091
          Facsimile Number:  (847-256-1681)

      (b)    If to Lender, at the following addresses:

          Joel Brosk (joelbrosk@aol.com)
          Brozosky & Brosk PC
          40 Skokie Blvd

       Northbrook, IL 60062
       Facsimile Number: 312-829-1110

     11.14   <u>Reversal of Payments</u>.  To the extent that Borrower makes a payment or payments to Lender that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver, or any other party under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and shall continue in full force and effect, as if such payment or proceeds had not been received by Lender.

     11.15   <u>Survival</u>.  The representations and warranties of Borrower in this Agreement shall survive the execution, delivery and acceptance hereof by the parties hereto and the closing of the transactions described herein or related hereto.

     11.16   <u>Section Titles</u>.  The section titles and table of contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever.

     11.17   <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement.

     IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

          A.M. PRECISION MACHINING INC., debtor and debtor-in-possession

          By: _____

          JERZY KOZLOWSKI

          By: _____

          Name: _____

15

**SCHEDULE 2**
**BUDGET**